UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| United States of America ) | |
| ) | |
| v. ) | USDC No. 23-cr-96-01 (RDM) |
| ) | |
| Brian McGee, *defendant*. ) | |

DEFENDANT'S SENTENCING MEMORANDUM

Defendant, through undersigned counsel Nathan I. Silver, II, Esq., appointed by this Court under the Criminal Justice Act, submits this memorandum to aid at sentencing on November 8, 2023 at 10 o'clock a.m. when he appears via videoteleconference (VTC) before the Court for his sentencing hearing.

The defendant is a productive, law-abiding citizen with a minimal criminal record who pled guilty to the offense of Parading in a Capitol Building.  He served his country in the United States Air Force beginning in 1980, from which he was honorably discharged in 1983, and then enlisted in the Army National Guard, which he served until 2019, when again he was honorably discharged.  During that time, he served in combat zones in Iraq and Kuwait – both times in combat zones, where he had to go to bunkers during mortar attacks.   He was recognized for his contribution with a number of medals.  He also worked up until 2022 for the Federal Aviation Administration, past the date of his discharge, certified for HVAC maintenance and repair, and also avionic flight mechanics and airway transportation systems.[1]  The defendant submits that given his life story and contributions to this country, a sentence of probation for his conduct would be both appropriate and sufficient.

---

[1] Final Presentence Investigation Report ("PSR"), pp. 11-12, ¶53-57

The defendant therefore seeks a sentence of thirty-days (30) home confinement as a condition of six-months probation and a fine not to exceed one thousand dollars ($1,000) in lieu of a period of community service.

1. The defendant initially appeared before Moxila A. Upadhyaya on February 21, 2023, on a criminal complaint 22-mj-0033-01 (RMM) issued on Feb. 8 in this case. He was charged along with Jeremy Christian Harrison. The defendant was released on his own recognizance with conditions. (ECF Doc. 12, Feb. 21, 2023) Since then, he has been in compliance with the terms Judge Upadhyaya imposed.

2. The defendant stands charged, first in a criminal complaint, later in a criminal Information (ECF Doc. 21, April 20, 2023), with four misdemeanor offenses resulting from his presence during the Capitol Hill protests and riot of January 6, 2021: (a) Entering and Remaining in a Restricted Building (Count One), in violation of 18 U.S.C. §1752(a)(1); (b) Disorderly and Disruptive Conduct Which Impedes the Conduct of Government Business, in violation of 18 U.S.C. §1752(a)(2); (c) Disruptive Conduct in the Capitol Buildings, in violation of 40 U.S.C. 5104(e)(2)(D), and (d) Demonstrating, Picketing or Parading in a Capitol Building, in violation of 40 U.S.C. 5105(e)(2)(G) ("Demonstrating").

3. On June 23, 2023, per a Plea Agreement with the United States, the defendant entered a plea of guilty to Parading, a petty offense which carries a maximum sentence up to six (6) months imprisonment, a fine of up to $5,000, a term of probation not to exceed five (5) years and a $10 special assessment. As a petty offense, the U.S. Sentencing Guidelines do not apply. (Presentence Investigation Report ("PSI"), page 7, ¶27) The defendant agreed to pay $500.00 in

restitution toward defraying the cost of repairing damage to the U.S. Capitol, repairs which were necessary after the riot.

4. Defendant and his counsel have lodged no objections to the presentence report.[2]

5. While in the Capitol or on its grounds, the defendant did not commit any violent or destructive act, either to persons or property. He spent fewer than two (2) minutes inside the Capitol.

6. The defendant has a minimal criminal record, which consists of a Driving Under the Influence from 1983, for which he paid a fine following conviction. (PSR, page 8, ¶29, and a self-reported DUI conviction from Houston, Missouri in 1996, for which the probation office was unable to locate a record (PSR, page 8, ¶30)

7. The defendant's conduct consisted of traveling to Washington to attend the protest of the certification of the Electoral Vote scheduled for January 6. He and his codefendant attended the rally for then-President Trump and went to the Capitol together. "After the crowd (had) breached entrances to the U.S. Capitol, McGee and Harrison made their way up the west side of the grounds and entered the U.S. Capitol Building around 2:24 p.m., via the Senate Wing Door." (Statement of Offense, Doc. 32, pp. 3-4)

8. The defendant McGee and codefendant Harrison stayed in the U.S. Capitol Building for fewer than two minutes.

9. The defendant's entry into the Capitol was not to cause trouble or interfere with the certification of the electoral votes that he knew would take place. He came to Washington

---

[2] The report erroneously states that he held a job as a slot machine mechanic, when in fact he worked on sewing machines, and that he held his first job at the age of eleven when he was actually fourteen. (PSR page 12, ¶¶57 and 58)  But these are not material errors, and the defendant attributes them to the telephone connection during the interview.

simply to attend a rally and register his peaceful protest. He, like hundreds of others, entered the Capitol after others had breached it; there's no reason to think that he would have broken windows or attacked police in order to enter. Many who entered the Capitol mistakenly believed their conduct was protected by the First Amendment, which protects our rights to freedom of speech, of assembling to register grievances. Where the defendant and so many others were mistaken is that, although parading, demonstrating and picketing aren't themselves criminal, and don't even constitute misconduct or misbehavior, doing so inside the Capitol buildings is never permitted. ] The defendant, out of curiosity as much as anything else, went inside the Capitol, and while there acted peacefully and respectfully. He caused no injury to persons or property.[3]

    10. Under 18 U.S.C. §3553(a) the following factors: (a) Factors To Be Considered in Imposing a Sentence. - The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider - (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed - (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the

---

[3] Contrast the conduct of those who entered the Capitol, albeit when the Capitol was open, to protest the nomination of Brett Kavanaugh to the Supreme Court. Their stated purpose, planned in advance, was to disrupt the hearings, which they did. All but one of the protesters were charged under D.C. Code statutes, not federal law. For a discussion of this, see Defendant's Sentencing Memorandum, *United States v. Jenny Cudd,* 21-cr-0068 (TNM), pp. 49-54. Ms. Cudd made a number of inflammatory statements and 19 minutes inside the Capitol. She pled guilty to Entering and Remaining on a Restricted Building or Grounds, a Class A misdemeanor and guideline offense in violation of 18 U.S.C. 1752(a)(1), and was sentenced to two (2) months probation, a $5,000.00 fine and $500.00 in restitution. Defendant acknowledges that the appalling nature of the events of January 6 was different in kind from that involved with the Kavanaugh hearings.

defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner….

11. The government recommends a sentence of fourteen (14) days of intermittent confinement, three (3) years probation, sixty (60) hours of community service and the payment of $500.00 in restitution, an amount the defendant has already agreed to pay. (PSR, page 4, ¶9) It does so largely because of messages the defendant posted on social media starting nearly a month *after* January 6. ECF Doc. 44. Government's Sentencing Memorandum ("Govt. Memo"), filed Oct. 4, 2023, pages 5-7, 13-17. The government also characterizes as "false claim(s)" defendant's statements to the FBI "that the police defending the Capitol were 'oblivious to the crowd', did not tell protestors (sic) that they were not permitted to enter, and were welcoming and fist bumping protesters as he entered." (Govt. Memo, page 8)[4]

12. Contrary to the misimpression that the government's memo leaves the reader, the defendant cooperated completely with investigators from the time he knew he would be arrested: he consented to a search of his phone and to agent taking photographs of the clothing he wore on January 6, he spoke twice with the FBI, the first time by phone on August 8, 2021, the second, an in-person interview on Feb. 14, 2022, with his lawyer present. (When the agent, Patrick Casey, told the defendant during the August phone call that he'd like to follow up with an in-person interview, the defendant made arrangements to do so with his lawyer.) The defendant

---

[4] The government argues that the defendants "saw the signs of conflict resulting from the riot…saw law enforcement was using tear gas and pepper spray to defend themselves against the rioters…saw rioters climbing along the balustrades…saw knocked over bike racks…saw law enforcement officers in riot gear who were vastly overwhelmed and outnumbered…heard the incessant blaring of the fire alarm by the Senate Wing Door and saw the broken glass in the doors and windows. They saw rioters climbing into the Capitol through the broken windows." The defendant denies that the sights were visible, or the sounds audible, to him. All this is presumptuous; with the exception of a single photo (page 3) which proves nothing, there's no support for it in the government's memorandum.

takes particular offense at the notion that he made false claims about what he saw on the grounds of the Capitol or in the area leading up to the entrance. The defendant impresses one as a person incapable of telling lies.[5] He did not see signs of violent activity and was unaware from his vantage point of tear gas dispersed toward protesters; he saw from a distance of about twenty feet police officers high-five or fist bump others, though he admits he had no personal contact with them, and he saw no effort by the police trying to keep people from entering the building. It may be that these officers were methodically using de-escalation procedures; that would be consistent with both the defendant's observation and the officers' conduct.

13. Making false claims to the FBI interviewers would surely surprise the defendant's supervisor at his job at the Federal Aviation Administration. Agent Casey interviewed Jeffrey Branch, who managed the Columbia, Missouri Tech Operations Office of the FAA. Mr. Branch reported that "(Brian) McGee is a very hard working employee and his performance reviews have been exemplary. McGee fills in for Branch as manager when Branch is on vacation." (FD-302, Report of Investigation, Oct. 28, 2021)  What does this mean?  It means that the defendant is *trusted.*[6] Branch also noted that "McGee has not caused any major disciplinary issues for Branch, however McGee recently made some sarcastic remarks regarding mask and

---

[5] On this point, Steven J. Lammers, who served with the defendant in both Kuwait and Iraq, vouches for Mr. McGee's character trait of honesty: "I can tell you with complete certainty that Brian McGee has never lied to me." (*See* Exbhit - letter in allocutions from Steven Lammers MSG/USA Ret.)  His reference supports the defendant's account of his behavior the Capitol on January 6.

[6] Mr. Branch has provided a letter in allocution for the defendant, also in the attached Exhibit. In that letter, he, too, attests to the defendant's character: "The word I like best to describe Brian is Honorable."  His opinion of the defendant is based on his 37-year federal and navy career in which Mr. Branch was "both a co-worker and a supervisor" of him.

vaccine mandates in a meeting." (Id.)  In other words, the defendant is a person who speaks his mind.[7]

14. This gets into the government's characterization of the defendant as "a prolific writer of violent content." (Govt. Memo, page 7)  At the very least the messages are pungent, expressing the defendant's grave frustration with our politics at the time.  In fact, on May 14, 2021, he dismisses violence: "Once it's proven there was fraud and cheating and the left literally stole the oval office. What is going to be done to fix it? I don't want bloodshed or a civil war, but I'm not interested in waiting till 2022 or 2024 to have the rightfully elected President calling the shots." (Govt. Memo, page 13)  It's really a lament that nothing can be done to reverse an outcome that he viewed as unjust.  In context, the defendant was popping off to others who he felt shared his frustration and worried for the future of the country.

It's important to note that these messages were written *after*, not before, January 6. The first one was posted on Feb. 4, 2021, nearly a month later.  More important, though, is that the messages themselves belie his actual conduct at the Capitol.  Contrary to the belligerent tone of his words, the defendant's actions were mild: he entered the building, spent fewer than two minutes inside, then went out.  In a way, it doesn't matter why he left when he did.  It might be simply that he joined the codefendant, to help him "try() to locate Harrison's wife in the crowd." (Govt. Memo, page 4)  But nothing was so compelling about the experience that it kept him from leaving.  **The fact is, others on January 6 followed up inflammatory messages they sent before that date with violent conduct  inside the Capitol on the 6th, fighting the police,**

---

[7] A supervisor for airport safety,  Jason Thomas of the Columbia (Missouri) Police Department was interviewed at the regional airport where the defendant worked. He seconded the view of Mr. Branch, reporting that the defendant "has never caused any security problems at the airport and appears to be a diligent worker." (FD-302, Report of Investigation, prepared by Agent Casey, Oct. 28, 2021)

**destroying property, causing mayhem, seeking to disrupt the lawful certification of electoral votes–or worse.** The defendant did nothing of the sort. In fact, in looking back on the event, the defendant told the FBI that it was like being at a concert where one wanted to get up close to get the best view. Likely, it was mere curiosity and the crowd's movement that impelled him to enter the building.

15. The defendant submits that a period of probation, in lieu of incarceration, combined if necessary with community service, would satisfy the "need for the sentence…to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense." During this time, the defendant would be answerable to the U.S. Probation Office. He would be subject to the jurisdiction of the Court, knowing that any infraction could lead to revocation of the probationary term, with incarceration to follow. Such a term would at the same time provide deterrence specific to the defendant, operating as a disincentive to further criminal behavior.

16. A term of probation would also deter generally. The public is aware, from the comprehensive coverage of the January 6 events and the arrests that followed, of the serious efforts the government has made to prosecute persons involved with the protests and, in many cases, the violence that was perpetrated. These cases, from beginning to end, have been watched very closely by the press where defendants live, so the public will be aware of the defendant's responsibility for his conduct. That can serve to deter others in the future in similar situations.

17. The defendant submits that a six-month probationary term would satisfy the various §3553 factors. Given that the defendant does not need the services (e.g., vocational, substance abuse, help with relocation of residence) that the U.S. Probation Office can provide, a longer

period of probation is not necessary.  The probation office can put to better use of its limited resources to cases that really need them.  The Court may also impose a fine up to $1,000, which the defendant is prepared to pay, in lieu of community service.   If the Court is inclined to impose a form of confinement, the defendant requests a period of home confinement of no more than thirty days, with an exception for employment, should he need it, outside the home.

18. The defendant was required to remove his firearms from his residence when ordered to do so as a condition of release. (ECF Docs. 12, page 2,  ¶7(k))   The defendant has been trained in the safe use and storage of firearms, and his possession would not threaten others, including but not limited to a U.S. Probation making a scheduled or impromptu home visit.

19. In many respects, this case resembles that of *United States v. Carrie Ann Williams*, also before this Court, in 21-cr-248-03.[8]  There, the defendant and her partner, both from Baltimore, and the defendant's cousin, an Alaskan, entered the Capitol and spent about five minutes inside before leaving peacefully.  The cases differ in that Ms. Williams's coming to Washington was not motivated by politics, while the defendant came here to attend a rally and protest, their conduct is nearly indistinguishable.  Yet, despite his political motivation, the defendant spent less time inside the Capitol than did Ms. Williams and her companions, which puts in perspective the mild nature of his conduct.

15. For all the reasons noted above, the defendant respectfully requests a sentence of probation combined with community service.

This pleading is,

Respectfully submitted,

---

[8] Ms. Williams received a sentence of the first 30 days on electronic location monitoring  and  twenty-four (2) months probation with no home confinement. (Doc. 106, page 4)

/s/

NATHAN I. SILVER, II
Unified Bar #944314
6300 Orchid Drive
Bethesda, MD 20817
(301) 229-0189 (direct)
(301) 229-3625 (fax)
email: nisquire@aol.com

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing pleading has been served via ECF on Melanie Krebs-Pilotti, Esq., USDOJ (Antitrust Division), USAO detailee, this 1st day of November, 2023.

/s/
_____
*Nathan I. Silver, II*